Marcus GRAHAM, Appellant,

v.

UNITED STATES, Appellee.

No. 04–CF–1015.

District of Columbia Court of Appeals.

Argued Oct. 19, 2006.
Decided June 19, 2008.

allegations will not be at issue on remand. All other counts are remanded for further consideration.

Thomas T. Heslep, Washington, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Kenneth Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., and Karen L. Melnik, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

A jury found appellant Marcus Graham guilty of robbing and killing his next-door neighbor, Lucille Batchelor.[1] Appellant's two confessions to the police, made four days after the murder, were the centerpiece of the prosecution's case, and his

---

1. Appellant was convicted of first-degree felony murder while armed (two counts), D.C.Code §§ 22–2101,–4502, the predicate felonies of first-degree burglary, D.C.Code § 22–801(a), and robbery of a senior citizen, D.C.Code §§ 22–2801, –3601(a), second-degree murder while armed, D.C.Code §§ 22–2103, –4502, attempted second-degree theft of a senior citizen, D.C.Code §§ 22–1803, –3211, –3212(b), –3601(a), and obstruction of justice, D.C.Code § 22–722(a)(2)(A) and (a)(6).

Fifth Amendment challenges to their admission are the principal focus of this appeal. Appellant asserts that his first confession, in which he admitted stealing from Batchelor but denied killing her, was the product of custodial interrogation not preceded by the required *Miranda*[2] warnings and a valid waiver of his rights. Appellant contends his second confession, in which he admitted committing the murder, was obtained in violation of *Edwards*[3] because the police allowed his mother to continue interrogating him after he invoked his right to counsel. Finally, appellant contends that the prolonged interrogation he endured together with other coercive factors operated to overcome his will and rendered his statements to the police involuntary. In addition to advancing these Fifth Amendment claims, appellant asserts the government violated its disclosure obligations under (i) *Brady*,[4] with respect to evidence supporting his suppression motion, and (ii) Criminal Rule 16,[5] with respect to the introduction of his statements at trial.

We conclude the trial judge did not err by denying appellant's motion to suppress his statements. Specifically, we hold appellant was not in custody for purposes of *Miranda* when he made his first confession; the police did not violate appellant's Fifth Amendment right to counsel by permitting his mother to question him after he asked for an attorney; and his statements to the police were not the product of impermissible governmental coercion. We also reject appellant's other claims of error

and therefore affirm appellant's convictions.

## I.

The trial judge orally denied appellant's motion to suppress his statements after a pretrial evidentiary hearing at which three witnesses testified. The main witness was Metropolitan Police Department Detective Jeffrey Williams, who was in charge of the investigation of Batchelor's murder, questioned appellant, and obtained his confessions. The judge also heard brief testimony from Detective Christopher Kauffman, who assisted Williams and made contemporaneous notes during the questioning of appellant, and from appellant himself. In a post-verdict motion for a new trial, appellant asked the judge to reconsider his ruling admitting his confessions in light of all the evidence—including a videotaped interview of appellant's parents by Detective Williams that had been withheld from appellant until the middle of trial. The judge denied appellant's request for reconsideration in a written opinion.

■ The judge specifically credited much of Williams's testimony, finding it corroborated by Kauffman's notes and other evidence. The judge did not credit appellant's testimony. We summarize the evidence relevant to appellant's Fifth Amendment claims, including the videotape interview turned over after the suppression hearing, in accordance with the trial judge's credibility determinations and findings of historical fact.[6]

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

4. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

5. Super. Ct.Crim. R. 16.

6. We defer to the trial judge's factual determinations unless they are clearly erroneous. *See, e.g., Jones v. United States,* 779 A.2d 277, 281 (D.C.2001) (en banc).

## A.

On Sunday morning, November 17, 2002, sixty-seven-year-old Lucille Batchelor was murdered in her apartment in Southeast Washington, D.C. Her body was discovered that afternoon. She had been beaten about her head and stabbed in her chest, and the dresser drawers in her bedroom had been ransacked. Canvassing the neighborhood for witnesses, Detective Williams spoke with appellant, nineteen-year-old Marcus Graham, who lived next door to Batchelor. Appellant told Williams he had taken soup and tea to Batchelor on Saturday afternoon, the day before the murder, at his mother's request. Pressed for time, Williams said he would meet with appellant at a later time to take a formal statement.

### The First Confession

Four days later, on November 21, 2002, Williams returned to appellant's home with Detective Kauffman. Williams asked appellant "if he would mind coming to my office and talking to me in reference to Ms. Lucille's death." Appellant agreed to do so, and he rode with the two detectives in an unmarked police car to the Violent Crime Branch at a police station in Southeast Washington, D.C. Appellant sat in the front passenger seat. He was not frisked or handcuffed.

Upon arriving at the Violent Crime Branch at 2:52 p.m., Williams escorted appellant past some secured doors to a small room used for conducting interrogations and interviews. The door to the room locked automatically; it was necessary to punch in a special code on a keypad to enter or exit the room. Williams propped open the door with a chair to improve ventilation and, as he testified, so that appellant would not feel "closed in." At some point later in the afternoon, however, Williams allowed the door to close. Unbe-

knownst to appellant, Kauffman listened in on the interview from an adjacent room equipped with audio and visual equipment.

Williams, who was unarmed, employed a conversational tone when questioning appellant. After inquiring whether appellant wished to use the bathroom or have something to eat, Williams began the interview by asking him about his visit with Batchelor the day before she was killed. Appellant affirmed his earlier statement and added that on Sunday morning he was at church with his wife, his parents, and other members of his family. After something less than half an hour, at 3:22 p.m., Williams excused himself and left the room to phone Daniel Zachem, the Deputy Chief of the Homicide Section of the United States Attorney's Office. Williams sought Zachem's advice as to whether he was required to read appellant his *Miranda* rights before questioning him further. Zachem advised Williams that *Miranda* warnings were unnecessary because appellant had come to the Violent Crime Branch voluntarily and had not been taken into custody. While Williams was talking with Zachem, appellant was left alone in the interview room with the door open.

Williams returned to appellant at 4:10 p.m. In response to the detective's increasingly focused questions, appellant said he left church on Sunday at 11:15 a.m. and went straight home, making no stops on the way. He denied having gone to a bank after church or at any time that weekend; denied having either an ATM card or a bank account; and denied having received property belonging to someone else. At 4:35 p.m., appellant declined Williams's renewed offers to let him go to the bathroom and have something to drink or eat.

Williams then momentarily left the room again. He returned five minutes later, at 4:40 p.m., with a bank surveillance photograph showing appellant by a Sun Trust

Bank ATM machine at Stanton Road and Alabama Avenue, Southeast. The time-stamped photograph had been taken at eleven o'clock on Sunday morning, November 17, 2006. Confronted with the photograph and the (concededly false) assertion by Williams that a witness had identified him, appellant admitted that when he brought Batchelor soup and tea on Saturday, he stole credit cards and $15 in cash from a purse on her table. Appellant said he tried to use one of the cards at the bank, but was unsuccessful because he did not have the PIN.

At 5:25 p.m., after making those admissions, appellant asked to use the bathroom down the hall. Williams entered the code to open the interview room door and allowed appellant to walk down the hall to the bathroom by himself. The bathroom was located near the building's exit, which was not locked. It is not clear from the record whether appellant knew it or not, but as Kauffman later testified, "there was nothing to stop him" from leaving the police station at that time. When appellant returned to the interview room, Williams again offered to get him something to eat or drink, which he declined. At 6:10 p.m., following additional probing by Williams of appellant's account, Kauffman entered the room with a large pizza. Appellant was offered some pizza but did not take any of it.

Williams then asked appellant if he would agree to make a formal statement, which could either be transcribed on a typewriter or videotaped. Appellant agreed and chose to be videotaped. The taping began at 7:00 p.m. and lasted 55 minutes. Appellant repeated his earlier statements about the theft, explaining that he was in need of money and saw an

opportunity to get some fast. He denied going to Batchelor's house on Sunday or having anything to do with her death. Appellant confirmed he had come to the police station voluntarily; no one had threatened or forced him to make a statement; he had been offered food and drink; he had been able to leave the room and go to the bathroom on his own; he was not under the influence of drugs, prescription medication, or alcohol; and he had completed the 11th grade and could read and write.

### The Second Confession

While appellant was being videotaped, his parents, Irene and Clarence Perry, arrived at the station. They had not been summoned, but came on their own initiative. Williams met with them, told them appellant had been photographed using Batchelor's credit card, and said he did not believe appellant was being completely truthful. Appellant's mother asked to speak with her son. At 8:25 p.m., Williams escorted her into the interview room and left her alone with him. Appellant and his mother spoke privately for one hour and 25 minutes. Kauffman turned down the volume of the monitoring equipment in the next room so that he could not overhear their conversation.

When Irene Perry finished meeting with her son, Kauffman entered the interview room. Appellant stood up and walked toward the door, saying "he wanted to leave" and "was ready to go." At that point, Kauffman told appellant he could not leave because he was under arrest for murder. The time was 10:05 p.m. (approximately seven hours after appellant arrived at the station).[7]

7. As the lead detective on the investigation, Williams was displeased to learn Kauffman had placed appellant under arrest without his approval. He considered the probable cause showing to arrest appellant for murder to be weak, and had not yet decided whether to

Meanwhile, after emerging from the interview room, appellant's mother told Williams she did not believe her son was telling "the whole truth." Williams proceeded to conduct a lengthy interview of appellant's parents; with their permission, it was videotaped. Irene Perry described how appellant had brought some soup and tea to Batchelor on Saturday evening because the elderly woman had complained of a cold. The next morning, the family went to church. Sometime before 10:30 a.m., appellant left the service abruptly following an argument with his wife, and he did not return home until shortly after 1:30 p.m. A little later, Irene Perry learned that Batchelor had been killed. Almost immediately, she stated, she began to wonder if appellant was involved:

I just started thinking, you know. I'm a very suspicious type. I mean, like a private investigator.... So, with Marcus being the type of person that won't rightfully—won't tell you the truth right up front, I have to get my truth myself.

Perry said she was suspicious of appellant because "he's different than the rest of the kids. He's not serving Jehovah. He's been in the street ... you know, he acts kind of thug-ish." Moreover, she told Williams, he had stolen credit cards and other things in the past and recently was "pressed for money." Acting on her suspicions, Perry stated she went into appellant's room and examined his clothing "because if I find something, I'm going to turn it in." She found nothing incriminating, however. She then confronted appellant directly. Appellant told her he knew nothing about Batchelor's death.

Irene Perry also described to Williams the conversation she had just had with her son at the police station, in which she had pressed appellant for incriminating admissions:

I told him ... I want you to be honest with me, you know. And I kept telling him to look at me, you know, because I say a lot of times when he do [sic] something wrong. I am pretty much aware when he does something wrong. So I said, did you do it? And he said, well, I did take the credit card, but I didn't take, I didn't take her life....

I asked him why did he do it, you know, I kept on that, and I said that's somebody's mother, grandmother, and, you know, how do you feel about that, or would you want this to happen to your wife or your grandmother or anything like that.... I was trying to get him to admit that, you know, whether or not he done it.... And I kept telling him, Marcus, you know you need help because you don't never admit to what you've done wrong; this is something that you've been doing through the years; you never take responsibility for your own actions, and then you don't have any remorse; you robbed a elderly lady, why would you do that? And he, he just kind of rubbed his head, I'm tired, man; I ain't do this....

But I told him ... I think personally you did it, you know; look at me.... I said, why don't you just be honest about what you done; get yourself some help.... [Y]ou got a problem; it's in black and white you have one, and you need to admit to your problem.

Perry told Williams that when she asked appellant how he would feel if his wife were killed, he "got real mad," and she feared he might "wind up lashing out" at her. He had been violent in the past,

arrest appellant at that time or, instead, apply for an arrest warrant. See D.C.Code § 23–581 (2001 & Supp.2007) (specifying when law enforcement officers may arrest without a warrant).

toward her and others. When asked by Williams what she thought after talking with her son, Perry responded, "I don't know what to think. But I, I just—I think it's a little more to the story than he's telling."

At the conclusion of this interview, around 11:20 p.m., Irene Perry asked if her husband could speak with appellant ("My husband maybe can help him, if he knows something"). Williams agreed, and Clarence Perry met privately with appellant for eleven minutes.

Thereafter, at 12:05 a.m., Williams re-entered the interview room and (for the first time) advised appellant of his *Miranda* rights. Appellant filled out and signed a PD–47 card, waiving his Fifth Amendment rights and agreeing to talk to the police without an attorney present. Williams then interrogated him for about an hour but obtained no new information. At 1:01 a.m., appellant asked to speak to his father again. Williams allowed the two to talk privately. When Clarence Perry came out, he reported his son continued to say that he had not murdered Batchelor. Mobile Crime officers then briefly entered the room to take photographs and retrieve appellant's shoes and jacket.

At 1:34 a.m., Williams and appellant's mother returned together to the interview room. The trial judge found that Williams accompanied Irene Perry because she had expressed concern for her physical safety when she was alone with appellant earlier. Williams testified he did most of the speaking, though, exhorting appellant and telling him he was not being "totally truth-ful." From time to time, Perry chimed in, asking accusatory questions such as, "Did you want to hurt Ms. Lucille?" and "What was you thinking about?" Appellant de-nied hurting Batchelor and said he wanted "quick money."

After almost half an hour, at 1:59 a.m., appellant stated "my father said that if I didn't do it, then he would get me a lawyer and everything. So, I want a lawyer. You know, I am going to do like my father said. I want a lawyer." Williams immediately left the room, explaining to appellant that his request for a lawyer meant he had to stop questioning appellant ("I am not go-ing to violate your rights"). Williams did not ask appellant's mother to leave with him, however. Instead, he allowed her to remain in the room alone with her son, who did not object to her presence. In the next room, Kauffman again turned down the volume of the monitoring equipment so as not to overhear their conversation. Williams went to a desk about fifteen yards from the interview, where he busied himself with paperwork.

At 2:43 a.m., appellant and his mother knocked on the window of the door and waved to Williams to come back. When he returned, Perry said her son had "some-thing to say." Appellant began to explain that he had smoked PCP before going to Batchelor's apartment, where he had pushed a chair at her and caused her to fall and hit her head. Williams stopped appellant and, in the presence of both par-ents, re-administered the *Miranda* warn-ings. Appellant executed a new waiver of his Fifth Amendment rights. Following a trip to the bathroom (this time, escorted by Williams), appellant resumed his con-fession.

When he left church early on Sunday morning, appellant stated, he purchased and smoked some PCP and took the bus to Batchelor's house. After letting him in, Batchelor went to use her bathroom. While she was there, appellant saw her purse lying on the table. He unzipped it and removed $15 and two credit cards. At that moment, however, Batchelor re-turned. Catching him in the act, she

started yelling at him and coming toward him. Appellant kicked a chair at her, causing her to fall and hit her head hard on the table. He then picked up a metal pole and hit Batchelor on her head and shoulders. He did not remember whether he also had stabbed her with a knife. By way of explanation, appellant said he had "tripped out" and was "lunching" (high on PCP). Next, appellant went into Batchelor's bedroom but found nothing there worth stealing. He then went to the bank where he attempted to use Batchelor's credit cards. Appellant expressed remorse for what he had done and said it was "not something that he was proud of."

After making this confession to the murder, appellant agreed to repeat his statements on videotape. The recording was made between 3:25 a.m. and 3:50 a.m. with both his parents present. By this time in the morning, appellant was noticeably fatigued. At times he rested his head on the table at which he was seated, his answers to questions were frequently terse, and sometimes he had to be prompted to respond. Williams testified at the suppression hearing that they "were all tired and sleepy." However, the trial judge subsequently observed, appellant was oriented and coherent in his exchanges with Williams, and he responded appropriately and with evident awareness of the gravity of the situation. Many of the questions required appellant to give more than simple "yes or no" answers and to describe events in his own words, which he was able to do. Appellant acknowledged that Williams did not "force" him to confess, that he waived his *Miranda* rights after

inviting Williams back into the room, and that he was telling the truth and not merely saying what he thought Williams wanted to hear.

At the end of the recorded interview, appellant's mother confirmed that Williams had not asked her to speak to appellant on his behalf. Perry said that once her son told her what she believed to be the truth, she "told him to admit to the truth and for him to knock on the door, rather than me, to tell you all [the police] what the truth is.... And that's what he did." Williams himself testified at the suppression hearing that he never asked appellant's parents to talk to him. In his experience, he said, parents sided with their children; this was the first time a parent had gotten a child to confess.

The record of the suppression hearing does not disclose everything Irene Perry said to appellant in their final private meeting to persuade him to admit having murdered Batchelor. Perry herself was not a witness at the hearing, and appellant was not asked about his conversations with his mother; nor did he explain why he finally admitted to having murdered Batchelor.[8] The trial judge inferred that Perry appealed to her son's conscience by urging him to be completely truthful, take responsibility for his actions, and recognize that he needed help. At trial, as a government witness, Perry testified that she asked her son what he had done and urged him to be honest, and "eventually he said he did it." Perry also said that in her talks with him at the police station, appellant was very tired—"he kept laying his head down. I had to keep waking him

---

8. In his limited testimony at the suppression hearing, appellant stated he did not believe he was free to leave the Violent Crime Branch office. According to appellant, the door to the interview room was never propped open; he always was accompanied when he went to the bathroom; and he did not understand

that the doors at the police station were unlocked from the inside. Appellant also claimed he asked to leave the station several times, including soon after he arrived, but Williams kept telling him to wait (saying "hold on" and "not right now"). The trial judge did not credit appellant's claims.

up." Appellant testified at trial that his mother "badgered" him until he gave in ("[S]he kept on talking to me, telling me that I needed to go ahead and confess up to it, that she know that I did it and just kept on going, kept talking to me, kept on badgering me, kept on, kept on constantly"). Appellant also said that when he finally gave in to her "pounding," he was "exhausted, confused, ... tired."

## B.

In denying the motion to suppress, the trial judge addressed and rejected each of appellant's Fifth Amendment claims. The judge found that appellant voluntarily accompanied the detectives to the Violent Crime Branch and was free to leave until 10:05 p.m., when Kauffman told him he was under arrest for murder. Appellant therefore was not questioned while he was "in custody" without having first received *Miranda* warnings and having waived his rights. Because appellant's first confession was not the product of custodial interrogation, the judge ruled, it was not obtained in violation of *Miranda.*

The judge further ruled that the police did not violate appellant's Constitutional rights by allowing his mother to question him after he requested an attorney at 1:59 a.m. "At no time," the judge found, did appellant's parents "collude with or take instruction or guidance from the police," and they did not act as "agents of the police." Rather, the judge concluded, "[t]hey acted solely in their private capacities as parents of [appellant], exerting moral pressure in appealing to [appellant's] conscience." Further, addressing whether the detective's action permitting Perry to remain with appellant amounted to the functional equivalent of police interrogation, the judge found that Williams "was, or should have been, aware" that Irene Perry "would probably continue to ask" appellant incriminating questions. He also found that Williams was aware of the "possibility" her questioning of appellant "would lead to further incriminating statements" by him, and that Williams allowed appellant's mother to remain with him in "hope of such responses." Nonetheless, the judge found, "the hoped-for [inculpatory] responses were ... very unlikely, and though they in fact occurred, they were surprising to Detective Williams and unexpected by him. [Appellant's] responses were anomalous in light of Detective Williams' experience." Consequently, the judge concluded, "[b]y allowing [appellant's] mother continued access to [appellant], police officers did not deliberately elicit incriminating statements, either directly or indirectly."

Lastly, considering the totality of the circumstances, the judge concluded that appellant's statements were voluntary. Among other things, appellant was never threatened or physically harmed, he was not under the influence of alcohol or drugs, and he was offered food and drink and allowed to use the restroom whenever he wished. He had completed the 11th grade in high school, could read and write, and had previous exposure to the criminal justice system, including prior criminal convictions. Although appellant became very tired by the time of his second videotaped confession, he "possessed physical stamina" and "strength of will," and remained "oriented," "coherent," and "aware."

## II.

Appellant contends his first, partial confession should have been suppressed because it was not preceded by *Miranda* warnings.[9] These warnings are

9. *See Miranda,* 384 U.S. at 479, 86 S.Ct. 1602 (holding that before a suspect in custody may

required to preserve the suspect's Fifth Amendment privilege against compelled self-incrimination.[10] *Miranda* warnings are required as a prelude to interrogation, however, only for one who is in "custody."[11] We agree with the trial judge and the government that appellant was not in police custody when he confessed to theft at 4:40 p.m. and (on videotape) at 7:00 p.m.[12]

A *Miranda* "custodial situation" is not necessarily created whenever a suspect is detained for investigative purposes. Even "if a reasonable person would not have thought himself free to leave, additional analysis is required because ... not every seizure constitutes custody for purposes of *Miranda*."[13] "Custody" for *Miranda* purposes requires either a formal arrest or its practical equivalent, a "restraint on freedom of movement of the degree associated with a formal arrest."[14]

A finding of custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[15] The test is "how a reasonable person in the suspect's situation would perceive his circumstances."[16] Whether the evidence establishes custody is a question of law as to which appellate review is *de novo*.[17] In answering that question, this court is obliged to view the evidence of record in the light most favorable to sustaining the trial court's ruling.[18]

Appellant was not yet under formal arrest when he confessed to theft at 4:40 p.m. and again at 7:00 p.m.,[19] but he claims the police had restrained his freedom to the degree associated with a formal arrest. Indeed, appellant asserts he was in police custody "from the moment he got into their automobile and was driven to the police station."[20] We disagree.

be interrogated, he must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires").

10. *Id.* at 444, 86 S.Ct. 1602.

11. *See California v. Beheler*, 463 U.S. 1121, 1123–25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

12. The government argues, in the alternative, that even if appellant's first, partial confession was obtained in violation of *Miranda*, its erroneous admission at trial was harmless because appellant's second, full confession was properly admitted under *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). *See Ford v. United States*, 931 A.2d 1045, 1051–52 (D.C.2007). We find it unnecessary to reach this argument.

13. *See In re I.J.*, 906 A.2d 249, 256 (D.C.2006) (internal quotation marks and citations omitted); *Morales v. United States*, 866 A.2d 67, 73 (D.C.2005).

14. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (internal quotation marks and citations omitted).

15. *Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526.

16. *Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *see also Berkemer v. McCarty*, 468 U.S. 420, 434, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

17. *Morales*, 866 A.2d at 72.

18. *Id.*

19. "Generally, an arrest is effected when the police have made a determination to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court." *In re M.E.B.*, 638 A.2d 1123, 1126 (D.C.1993). Kauffman placed appellant under formal arrest at 10:05 p.m.; prior to that time, Williams had not decided whether to arrest appellant.

20. Brief of Appellant at 21.

To begin with, the evidence establishes that appellant went to the Violent Crime Branch of his own free will to assist the police as a witness in their investigation of Batchelor's murder. There was no coercion and no suggestion that appellant was being detained. Williams simply asked him, in a non-threatening manner, if "he would mind coming to my office." When appellant agreed, he was not searched or frisked, nor was he handcuffed or otherwise restrained; and he rode to the station in the front seat of an unmarked vehicle—"hardly the conventional means of transporting an individual under arrest for murder."[21] Appellant was treated, in other words, like a witness, not an arrestee. These facts militate against a finding of custody.[22]

At the police station, Williams consciously undertook to avoid an "atmosphere of coercion and custody."[23] Appellant was not handcuffed during the interview, and prior to his arrest at 10:05 p.m., he was not searched or patted down. No weapons were brandished in appellant's presence.[24] No booking procedures were commenced. Appellant was offered food and drink repeatedly and given the opportunity to use the restroom. At 3:22 p.m., when Williams went to phone an Assistant United States Attorney, he left appellant alone with the door open for three-quarters of an hour. At 5:25 p.m., *after* appellant had confessed to stealing from Batchelor, he was allowed to walk to the bathroom without an escort. Past decisions of this court involving station house questioning of suspects have recognized that such treatment is not custodial; rather, it implicitly conveys the message that the subject of the questioning retains his liberty and is not under arrest.[25]

While Williams and Kauffman did not tell appellant he was free to terminate the interview, they also did not "threaten [him] with arrest or tell [him] that [he] had no choice but to cooperate with them."[26] Williams's tone as an interrogator was conversational and non-threatening; his questioning did not become belligerent or menacing, even when it focused on appellant's culpability.[27] Furthermore, this is not a case in which prolonged interrogation signaled to appellant before he admitted any culpability that the police would hold him indefinitely and against his will. Williams questioned appellant for only about half an hour before he confessed his theft of Batchelor's money and credit cards.[28]

21. *Morris v. United States,* 728 A.2d 1210, 1216 (D.C.1999).

22. *See, e.g., Resper v. United States,* 793 A.2d 450, 457 (D.C.2002); *Morris,* 728 A.2d at 1215–16; *Calaway v. United States,* 408 A.2d 1220, 1225 (D.C.1979). *Cf. Ford,* 931 A.2d at 1048–49 (viewing the question of custody as "a complex and close one" where, *inter alia,* the police brought the suspect to the police station (1) after telling him that he was "wanted for questioning" about a murder and "would *need* to" come there, and (2) "after frisking and handcuffing him when he agreed to go with them").

23. *Morales,* 866 A.2d at 72.

24. *See id.*

25. *See McFadden v. United States,* 945 A.2d 1203, 1207 (D.C.2008); *Morris,* 728 A.2d at 1216; *Johnson v. United States,* 616 A.2d 1216, 1230–31 (D.C.1992).

26. *Morales,* 866 A.2d at 72.

27. *Cf. United States v. Gayden,* 492 A.2d 868, 873 (D.C.1985) (finding a show of authority sufficient to restrain suspect's liberty when two detectives confronted him in a sharply accusatory manner following several hours of interrogation by other officers).

28. *Cf. Morris,* 728 A.2d at 1213–14, (four-and-one-half hour interrogation at police station not custodial); *Johnson v. United States,* 616 A.2d 1216, 1230 (D.C.1992) (same).

It is true there are factors on the other side of the ledger, factors our cases have found to be suggestive of custody. "Police questioning of a suspect ... in any police facility, regardless of where within the building or facility the questioning takes place, raises significant concerns for which *Miranda* warnings are an appropriate prophylactic against compelled self-incrimination." [29] We have recognized the coercive potential inherent in "police dominated surroundings" out of public view.[30] Furthermore, appellant confessed only after Williams showed him the incriminating bank surveillance photograph and stated that a witness had identified him. A suspect confronted by the police with "obvious evidence of guilt" may assume he will not be allowed to leave.[31] Similarly, once appellant made his first incriminating admissions in response to that evidence, Williams continued interrogating him for a considerable length of time without advising him of his *Miranda* rights. A reasonable person might not feel free to leave after implicating himself at the police station.

The Supreme Court has cautioned, however, that *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." [32] Similarly, in *Mathiason*, the Court held that confronting the suspect with evidence of his guilt

did not, without more, render a station house interview custodial.[33] Indeed, the Court has emphasized, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." [34] And though "admissions of culpability may lead the police either to arrest a suspect or to place restraints on his freedom approximating an arrest," they do not establish the beginning of custody if the police "never altered the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial." [35] We are obliged to weigh "all of the circumstances surrounding the interrogation" before reaching a conclusion.[36]

We think the balance tilts against a finding that appellant's first confession was the product of custodial interrogation. Ultimately, the police did not treat appellant as if he was being arrested. Even after 4:40 p.m., when appellant first admitted having stolen Batchelor's money and credit cards, the police did not place him under formal arrest, and they did not impose restraints on his freedom of movement of the degree associated with a formal arrest. Not only did Williams permit appellant to leave the interview room unattended, he even asked appellant if he would "agree"

29. *United States v. Turner,* 761 A.2d 845, 852 (D.C.2000).

30. *Id.; see also Ford,* 931 A.2d at 1049.

31. *Miley v. United States,* 477 A.2d 720, 722 (D.C.1984); *see also In re I.J.,* 906 A.2d at 264.

32. *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711; *accord Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517.

33. *Mathiason,* 429 U.S. at 495–96, 97 S.Ct. 711. The Court perhaps exaggerated, however, in saying that telling a parolee his fingerprints had been discovered at the scene of the crime had "nothing to do" with whether he was in custody. *Id. See* 2 WAYNE R. LaFAVE ET AL., CRIMINAL PROCEDURE § 6.6(d) (3d ed.2007).

34. *Stansbury,* 511 U.S. at 325, 114 S.Ct. 1526.

35. *State v. Lapointe,* 237 Conn. 694, 678 A.2d 942, 958 (1996).

36. *Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526.

to repeat his admission of the theft in a formal statement. Appellant's confession (to only a misdemeanor offense, theft) did not necessarily entail his immediate arrest, and Williams did not react as if it did. We conclude that a reasonable person in appellant's shoes would not have perceived himself to be under arrest, or to be subject to a curtailment of his liberty comparable to a formal arrest, when he gave his first confession.[37] That confession, therefore, was admissible in the government's case-in-chief, notwithstanding the absence of *Miranda* warnings.

### III.

■ Appellant contends his second confession, in which he admitted murdering Batchelor, should have been suppressed under *Miranda* and *Edwards* because the police obtained it by allowing his mother to question him after he invoked his Fifth Amendment right to counsel at 1:59 a.m., following his arrest.[38] We disagree, though our reasons for doing so are not entirely congruent with those of the trial court.

■ In *Miranda*, the Supreme Court held that if a person in custody "states that he wants an attorney, the interrogation must cease until an attorney is present."[39] The Court extended that principle in *Edwards* by adopting a *per se* rule: once a suspect in custody invokes his right to counsel, not only must the current interrogation cease, but he may not be subjected to "further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."[40] *Miranda* defined the term "interrogation" as "questioning initiated by law enforcement officers."[41] However, as the Court explained in *Innis*, " 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[42] This test of whether police engaged in the functional equivalent of express questioning "focuses primarily upon the perceptions of the suspect, rather than the intent of the police."[43]

37. Appellant's apparent belief that he could leave the station at 10:05 p.m., when he told Kauffman he was "ready to go," arguably lends evidentiary support to our conclusion. Inasmuch as the *Miranda* custody inquiry is an objective one, however, we do not rely on appellant's subjective understanding. *See Morales*, 866 A.2d at 73–74.

38. Appellant also claims his Sixth Amendment right to counsel was violated when police officers permitted his mother to speak with him. The Sixth Amendment right to counsel, however, attaches only "at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (internal quotation marks and citation omitted).

39. 384 U.S. at 474, 86 S.Ct. 1602.

40. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If an accused does initiate communications with the police after having refused to answer questions without counsel, the police nevertheless may not interrogate him in the absence of an attorney unless he knowingly and intelligently waives his right to counsel. *Id.* at 486 n. 9, 101 S.Ct. 1880.

41. 384 U.S. at 444, 86 S.Ct. 1602.

42. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted).

43. *Id.* The intent of the police may have evidentiary significance, however, in establishing whether they should have known their words

After he demanded an attorney, appellant claims, his interrogation did not cease; instead, Williams improperly engaged in the functional equivalent by allowing his mother to remain in the interview room, where she could continue pressing him to tell the whole truth and confess to Batchelor's murder. Appellant argues his mother was "simply a tool used by police to continue the interrogation process" in the "coercive atmosphere of the interrogation room,"[44] and Williams should have known she was likely to elicit an incriminating response from him. The fundamental problem with this argument, in our view, is that Irene Perry's private questioning of appellant was not state action subject to Fifth Amendment requirements. Merely allowing Perry to speak to appellant did not amount to official interrogation triggering the application of *Miranda* and *Edwards*.

 Only "state action" implicates a defendant's rights under the Fifth Amendment. As the Supreme Court explained in *Connelly*, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion.... [T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.' "[45] Accordingly, *Miranda* is concerned with "the danger of coercion result[ing] from the interaction of custody and *official* interrogation,"[46] and the *Edwards* rule is "designed to protect an accused in police custody from being badgered *by police officers*."[47] The procedural safeguards of *Miranda* and *Edwards* are required only where official interrogation generates "a measure of compulsion above and beyond that inherent in custody itself."[48]

Thus, numerous courts have held the dictates of *Miranda* and *Edwards* inapplicable to questioning of suspects in custody by private citizens acting on their own initiative.[49] For example, in *Snethen*, a case strikingly similar to this one, the defendant's mother told the police who were questioning her son about a homicide that "if [her son] did this, he will tell me."[50] The police allowed her to speak with him after he had been advised of his *Miranda* rights and had invoked his right to counsel. In the presence of the police and in a private conversation, the defendant's mother prodded him to confess. Declaring that "[i]t was 'coercion' by his mother that led to Snethen's inculpatory remarks, not by the police,"[51] the court found no *Miranda* or *Edwards* violation and upheld

or actions would evoke an incriminating response. "In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.* at 301 n. 7, 100 S.Ct. 1682.

44. Brief of Appellant at 30.

45. *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

46. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (emphasis added).

47. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (emphasis added).

48. *Innis*, 446 U.S. at 300, 100 S.Ct. 1682.

49. *See generally* LaFave et al., *supra* note 33, § 6.10(b).

50. *Snethen v. Nix*, 885 F.2d 456, 457 (8th Cir.1989).

51. *Id.* at 459–60 (citing *Connelly* ).

the admission of the confession.[52]

Appellant argues the police were sufficiently implicated in Irene Perry's questioning of him after he requested an attorney because Detective Williams knowingly allowed her to do so. In *Arizona v. Mauro*,[53] however, the Supreme Court concluded that the *Innis* definition of official "interrogation" was not satisfied by such minimal action on the part of the police. In *Mauro*, the defendant was arrested for killing his son. When the defendant was advised of his *Miranda* rights, he asked for a lawyer, and the police ceased questioning him in compliance with *Edwards*. Meanwhile, the police were questioning Mauro's wife, who also was a suspect in the homicide investigation. She asked to speak with her husband, and (with some reluctance) the police eventually allowed her to do so while an officer remained in the room. The officer did not ask Mauro any questions, but he recorded the conversation between Mauro and his wife with a tape recorder in plain sight. In response to his wife's questions, Mauro made incriminating statements, which the prosecution subsequently introduced at his trial for murder.

The Supreme Court held that the officers' actions after Mauro invoked his Fifth Amendment right to counsel, including their decision to allow Mauro's wife to see him, did not equate to interrogation within the meaning of *Innis*, because "Mauro was not subjected to compelling influences, psychological ploys, or direct questioning" by the police.[54] "[E]xamining the situation from [the defendant's] perspective," the Court "doubt[ed] that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way."[55] That the police knew there was a "possibility" Mauro would incriminate himself while talking to his wife was not enough to meet *Innis's* requirements; "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself."[56] The underlying purpose of *Miranda* and *Edwards*—"preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment"—was not implicated by the police actions "in any way."[57]

We see no relevant difference between *Mauro* and the present case. In compliance with *Edwards*, Williams immediately stopped questioning appellant when he asked for an attorney, and did not resume until appellant himself initiated further communications and waived his right to counsel. Williams did not subject appellant to "compelling influences, psychological ploys, or direct questioning;" he simply exited the interview room and left appellant's mother alone with him (which result-

---

52. *See also, e.g., Van Hook v. Anderson,* 488 F.3d 411, 428, 439 (6th Cir.2007) (en banc) ("The Constitution protects a suspect from official coercion-it does not protect a suspect from himself or his mother," who advised the defendant to "tell the truth" after he cut off questioning by asking for an attorney); *Roberson v. Commonwealth,* 185 S.W.3d 634, 640 (Ky.2006) (finding no *Edwards* violation where defendant's mother "freely volunteered to speak with her son to encourage him to confess in order to gain more favorable treatment"); *Whitehead v. Cowan,* 263 F.3d 708, 717–720 (7th Cir.2001) (same, where defen-

dant's sister-in-law was allowed to speak with him, eliciting confession, after telling police he would confide in her).

53. 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

54. *Id.* at 529, 107 S.Ct. 1931.

55. *Id.* at 528, 107 S.Ct. 1931.

56. *Id.* at 529, 107 S.Ct. 1931.

57. *Id.* at 529–30, 107 S.Ct. 1931.

ed in less police involvement in the ensuing interview than occurred in *Mauro* ). Irene Perry did not purport to be speaking to her son on behalf of the police. As in *Mauro*, a suspect in appellant's position would not have felt the police were coercing him to incriminate himself in any way by allowing his mother to speak with him. While appellant undoubtedly felt his mother was pressuring him, the police had no obligation to shield him from such pressure—the Fifth Amendment is concerned only with official coercion.

Appellant argues that, unlike the police in *Mauro*, Williams intended that his mother would try to elicit a confession. Further, he asserts, there was more than a mere "possibility" that she would succeed, because Williams knew or should have known it was reasonably likely—indeed, probable—that Irene Perry would elicit an incriminating response from her son. (Appellant contends the trial court clearly erred in finding otherwise.) There are statements in *Mauro* that arguably support the relevance of these distinctions. The Supreme Court specifically noted there was no evidence the police sent Mrs. Mauro to see her husband "for the purpose of eliciting incriminating statements."[58] And in a footnote, the Court said its decision "rests on a determination that the facts of this case do not present a sufficient likelihood of incrimination to satisfy the legal standard articulated in" *Miranda* and *Innis*.[59] These statements could be taken to suggest that whether a police decision to allow a private party to question a suspect amounts to official interrogation under *Innis* depends on the police officer's *purpose* or on the *likelihood* the private party will succeed in eliciting incriminating admissions.

We are not aware that any court has accepted such an interpretation of *Mauro*, however, and in our view it would be incorrect. On the contrary, "what seems to lie at the heart of the majority position in *Mauro* is that neither the subjective intentions of the police nor their perception of a significant likelihood that a certain scenario will prompt incriminating statements by the defendant is determinative.... Rather, ... it makes more sense to consider the objective purpose manifested by the police—that is, what an objective observer with the same knowledge as the suspect would conclude the police were up to."[60] As the Supreme Court has emphasized, "the danger of coercion results from the interaction of custody and official interrogation"[61] and "is determined from the perspective of the suspect."[62] Whether a suspect will feel coerced by official conduct depends on the objective character of that conduct, not on "the underlying intent of the police;"[63] nor on the effectiveness of unofficial overtures to the suspect. For coercion to be present, the suspect must perceive that the pressure to speak is emanating from the police; "[w]here the suspect does not know that he is speaking to a government agent"—or where, as here, the suspect knows he is not—"there is no reason to assume the possibility that the

58. *Id.* at 528, 107 S.Ct. 1931.

59. *Id.* at 529 n. 6, 107 S.Ct. 1931 (addressing the state court's conclusion that the police knew Mauro was "likely" to make incriminating statements when his wife confronted him).

60. LaFave et al., *supra* note 33, § 6.7(a), pp. 758–59.

61. *Perkins*, 496 U.S. at 297, 110 S.Ct. 2394.

62. *Id.* at 296, 110 S.Ct. 2394 (citing *Innis*, 446 U.S. at 301, 100 S.Ct. 1682, and *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

63. *Innis*, 446 U.S. at 301, 100 S.Ct. 1682.

suspect might feel coerced." [64] This is not a case in which private questioning was given the stamp of official authority, [65] nor is it one in which government officials forced the suspect to answer the private party's questions. [66] Despite the fact that, at one point, Williams and Perry questioned him together, appellant could not reasonably have viewed his mother as a state actor. Although appellant characterizes his mother as a "tool" of the police, the evidence amply supports the trial judge's findings that she was not acting as a government agent. [67] She questioned appellant in her own way, on her own initiative, for her own reasons, without any scripting, guidance, or encouragement from the police. And as the police never told him he had to speak to Perry, and he never objected to her presence, appellant cannot plausibly contend he was coerced into answering her questions simply because he was in custody.

We conclude that Williams did not engage in the functional equivalent of interrogation, or violate appellant's Fifth Amendment rights, when he allowed appellant's mother to remain with him and question him after he asked for an attorney. As Irene Perry was not a state actor, her questioning by itself does not implicate appellant's Constitutional rights.

## IV.

■■■■■ Next, appellant contends the trial court should have suppressed all of his statements to the police because they were involuntary and hence obtained in violation of his right to due process. [68] "[A]n involuntary statement is inadmissible at trial for any purpose." [69] Whether appellant's statements were voluntary is a question of law subject to *de novo* review on appeal, with the appropriate deference to the trial court's factual determinations. [70]

■■■■■ The government bore the burden of proving appellant's statements were voluntary by a preponderance of the evidence. [71] "The test for determining the voluntariness of specific statements 'is whether, under the totality of the circum-

64. *Perkins*, 496 U.S. at 299, 110 S.Ct. 2394.

65. *See, e.g., Estelle v. Smith*, 451 U.S. 454, 467, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (questioning by court-appointed competency psychiatrist implicates defendant's *Miranda* rights).

66. *See, e.g., Wilson v. O'Leary*, 895 F.2d 378, 380–81 (7th Cir.1990) (holding *Miranda* applicable where sheriff detained defendant against his will in a vacant lot so husband of victim could interrogate him).

67. Broadly speaking, as we recently stated in discussing the Sixth Amendment right to counsel, a private informant is not deemed a government agent "where the informant acts to elicit incriminating statements from a represented person on his own initiative, and not in furtherance of an express or implicit agreement with the government." *Watson v. United States*, 940 A.2d 182, 185 (D.C.2008) (citing *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986)).

68. Appellant does not separately challenge the voluntariness of his waiver of his *Miranda* rights. The voluntariness inquiry is the same in that context, however. *Connelly*, 479 U.S. at 169–70, 107 S.Ct. 515.

69. *United States v. Turner*, 761 A.2d 845, 854 (D.C.2000) (citing *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and *United States v. Carignan*, 342 U.S. 36, 38, 72 S.Ct. 97, 96 L.Ed. 48 (1951)).

70. *United States v. Bell*, 740 A.2d 958, 964 (D.C.1999); *see also Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

71. *Lego v. Twomey*, 404 U.S. 477, 484, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *see also Connelly*, 479 U.S. at 168–69, 107 S.Ct. 515; *Turner*, 761 A.2d at 854.

stances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion.' "[72] However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."[73] The Court insisted in *Connelly* on "the crucial element of police overreaching," without which "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible" under the Constitutional guarantee against official compulsion.[74]

▮▮▮▮▮▮ "In determining whether a defendant's will was over-borne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."[75] In general, the personal factors to be considered include the suspect's age, education, prior experience with the law, and physical and mental condition. The relevant details of the interrogation include its duration and intensity, the use of physical punishment, threats or trickery, and whether the suspect was advised of his rights.[76] By itself, the fact of a custodial interrogation in the absence of a valid *Miranda* rights waiver is insufficient to support a conclusion that the resulting statement was involuntary.[77]

We agree with the trial judge that the record establishes the voluntariness of appellant's statements at the Violent Crime Branch. As the judge noted, appellant was nineteen years old, literate, and not under the influence of alcohol or drugs. He had previous encounters with the police and criminal proceedings. It is true appellant became increasingly fatigued by around midnight, after he had been at the police station for approximately nine hours; we do not minimize the effects of fatigue in weakening a suspect's willpower.[78] However, in the absence of other egregious treatment, we think the fact appellant was "deprived of sleep and rest is not sufficient by itself to render [his] statement[s] involuntary."[79] The judge found appellant to be in good physical and mental condition overall even during his final videotaped statement, when he was merely reiterating the full confession he had made earlier. Appellant was well-treated throughout his interrogation, and Williams's questioning was never overbearing. Although the interrogation of appellant extended over thirteen hours, it was not continuous, and appellant was advised of, understood, and effectively exercised his *Miranda* rights (by asking for an attorney) before he ultimately waived his rights and confessed to the murder. Appellant complains that Williams engaged in trickery when he falsely told appellant a witness had identified him. But this ruse was "not calculated to produce an untrue

72. *Turner,* 761 A.2d at 854 (quoting *Fulminante,* 499 U.S. at 288, 111 S.Ct. 1246).

73. *Connelly,* 479 U.S. at 167, 107 S.Ct. 515.

74. *Id.* at 163, 166, 107 S.Ct. 515.

75. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

76. *Id.; see also Turner,* 761 A.2d at 854.

77. *Turner,* 761 A.2d at 854.

78. *See, e.g., Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (defendant's lack of sleep cited as one of several factors supporting finding of involuntariness); *Ashcraft v. Tennessee,* 322 U.S. 143, 154, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (confession produced by continuous questioning for thirty-six hours without rest or sleep held involuntary).

79. *Bell,* 740 A.2d at 965 n. 12.

statement," [80] and it demonstrably had little effect on appellant; we cannot conclude that it rendered an otherwise voluntary confession involuntary.[81] That appellant ultimately may have been worn down emotionally by his mother did not render his confession involuntary either, in the absence of coercive police practices taking advantage of his condition.

As appellant's two confessions were voluntary for purposes of the Due Process Clause, and not obtained in violation of *Miranda* or *Edwards,* we hold the trial judge properly admitted them in evidence.

## V.

 Finally, appellant claims the trial judge erred by failing to sanction the government for violating its discovery duties in two respects. First, he complains, the government disregarded its obligations under *Brady* by failing to turn over Williams's videotaped interview of his parents until after the suppression hearing. Appellant argues the videotape would have enabled him to impeach Williams's testimony that he did not know Perry would continue the interrogation after he left the interview room, and to establish that Perry was acting as a government agent in questioning appellant. The unavailability of the videotape at the suppression hearing was remedied, however; appellant was able to use it in asking the judge to reconsider his ruling on the suppression motion, and we have considered it in evaluating appellant's claims on appeal. In any event, as the trial judge ruled, the videotape did not contain material evidence favorable to appellant. Even without considering it, the judge did not credit the testimony appellant cites, and the tape does not show Perry was a government agent. Thus, appellant was not prejudiced by its late disclosure.[82]

 Appellant also complains of the government's late disclosure of certain statements he made to Williams when he confessed. Specifically, Williams testified at the suppression hearing that appellant expressed remorse (saying his conduct "was not something that he was proud of"). In addition, Williams testified at trial that when he asked appellant about his motive for killing Batchelor, appellant explained his wife had been pressing him about moving out of his mother's house, and he "came up with the idea that he would go try to rob Mrs. Batchelor" while smoking PCP. Appellant objected that these particular statements had not been disclosed in

---

**80.** *Davis v. United States,* 724 A.2d 1163, 1168 (D.C.1998) (quoting *In re D.A.S.,* 391 A.2d 255, 258 (D.C.1978)); *see also Turner,* 761 A.2d at 854; *Contee v. United States,* 667 A.2d 103, 104–05 (D.C.1995); *Beasley v. United States,* 512 A.2d 1007, 1015–16 (D.C.1986).

**81.** *See Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (officer's false statement that defendant's associate had confessed, "while relevant," held insufficient to make otherwise voluntary confession inadmissible); *see also* LaFave et al., *supra* note 33, § 6.2(c) at pp. 629–33 (noting that misrepresenting the strength of the evidence against a suspect generally has not been deemed sufficient to render a resulting confession involuntary).

**82.** *See Strickler v. Greene,* 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("'[S]trictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.").

pretrial discovery. However, appellant was not prejudiced by the belated disclosures, and we perceive no abuse of discretion in the judge's ruling that "[n]o sanction appears either necessary or feasible" for what he reasonably found to be an inadvertent and relatively minor oversight.[83]

## VI.

The judgment of conviction is affirmed. As some of the counts of conviction merge, we remand the case for the trial court to choose which ones to vacate. The sentences on the several counts were concurrent, so re-sentencing is not necessary.

*So Ordered.*

---

83. *See Davis v. United States,* 641 A.2d 484, 494 (D.C.1994) ("[T]he matter of what sanction, if any, is appropriate is within the discretion of the trial court, and we will reverse only where we find abuse of discretion coupled with substantial prejudice to appellant's rights.") (citations omitted).