**Mosiah GRAYTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 11–CM–640.**

District of Columbia Court of Appeals.

Argued April 10, 2012.
Decided Aug. 23, 2012.

Joel R. Davidson for appellant.

James A. Petkun, Assistant United States Attorney, with whom Ronald C.

Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time, and Clayton O'Connor, Assistant United States Attorney, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and BECKWITH and EASTERLY, Associate Judges.

EASTERLY, Associate Judge:

Appellant, Mosiah Grayton, was convicted of two counts of criminal contempt,[1] based on alleged violations of a preliminary injunction. The injunction was in the nature of a stay away order and prohibited Ms. Grayton from contacting Mary Jackson or coming within 100 feet of Ms. Jackson's home.[2] Ms. Grayton was charged with violating the preliminary injunction on August 3, 2010, and on January 14, 2011. In connection with the January 14, 2011, incident, Ms. Grayton was also convicted on one count of attempted threats.[3]

On appeal, Ms. Grayton challenges her contempt conviction arising from the August 3, 2010, incident, arguing that the government's evidence that she violated the preliminary injunction on that date was insufficient and was founded on hearsay that was improperly admitted under the excited utterance exception. Ms. Grayton also challenges her contempt and threats convictions arising from the January 14, 2011, incident, arguing that the trial court erroneously denied her motion to suppress statements she made to her court supervision officer and to a third party she called on her cell phone. Finally, Ms. Grayton challenges the trial court's denial of her motion, at the close of evidence, for judgment of acquittal on both contempt charges. Ms. Grayton contends that since she was charged under D.C.Code § 23–1329, which criminalizes contempt of a pretrial release order, the government was obligated but failed to prove that she was on pretrial release. She further contends that when the absence of that proof was noted after the close of evidence the trial court impermissibly permitted the government to amend the information and to prosecute her under D.C.Code § 11–944, the District's general contempt statute, and that she was prejudiced as a result because she was denied the right to a jury trial that the District's general contempt statute affords.

We hold that the government's proof of Ms. Grayton's contumacious conduct on August 3, 2010, was legally insuffi-

---

1. D.C.Code § 11–944 (2001). As explained below, the information erroneously cited D.C.Code § 23–1329 (2001).

2. At various points during Ms. Grayton's contempt trial, the preliminary injunction was incorrectly referred to as a civil protection order ("CPO"), notwithstanding defense counsel's reminder that CPOs are only issued under the intrafamily offense statute, D.C.Code § 16–1005 (2001). *See Shewarega v. Yegzaw*, 947 A.2d 47, 49 (D.C.2008) ("The statutory predicate for issuance of a CPO is a finding of good cause to believe that the respondent has committed or is threatening to commit an 'intrafamily offense' within the meaning of D.C.Code § 16–1001(5) [renumbered D.C.Code § 16–1001(8) (2001) ].").

Ms. Grayton and Ms. Jackson did not have an "intrafamily" relationship, as defined in D.C.Code § 16–1001; as discussed below, their only connection is through Ms. Jackson's grandson, with whom Ms. Grayton may have at one time had a romantic relationship. Moreover, the record reflects that Ms. Jackson filed a complaint in the Civil Actions branch on June 11, 2010, claiming that Ms. Grayton had committed the personal tort of harassment, and on June 18, 2010, Ms. Jackson was awarded a preliminary injunction to expire in one year. In light of these facts, we will refer to the June 18, 2010, order as a "preliminary injunction," as stated on the face of the order itself.

3. D.C.Code § 22–407 (2001).

cient[4]. Thus, we reverse that contempt conviction. We see no merit to Ms. Grayton's remaining arguments and otherwise affirm.

## I. Facts

At a bench trial held on March 31, 2011, complainant Mary Jackson testified that she first met Mosiah Grayton in 2009, when Ms. Grayton appeared at Ms. Jackson's front door looking for Ms. Jackson's grandson Christopher. Christopher had lived with Ms. Jackson since birth. It was Ms. Jackson's understanding that Christopher and Ms. Grayton had attended the same high school, and that Ms. Grayton was "infatuated" with Christopher. Christopher had left home for college in North Carolina in 2008. Apparently, Ms. Grayton continued to try to contact him through Ms. Jackson. No evidence was presented regarding the nature of these communications, but on June 18, 2010, Ms. Grayton was ordered by the Civil Division not to "assault, threaten, harass or physically abuse [Ms. Jackson] in any manner"; to "stay at least 100 feet away from [Ms. Jackson's] person, home, and workplace"; and not to contact Ms. Jackson "in any manner, including, but not limited to: telephone, in writing, or in any other manner either directly or indirectly through a third party." The order did not prohibit contact between Ms. Grayton and Christopher.[5] The duration of the preliminary injunction was one year, from June 18, 2010, to June 18, 2011. The government alleged that Ms. Grayton violated the preliminary in-

junction on two occasions: August 3, 2010, and January 14, 2011.

### A. Evidence Regarding the August 3, 2010, Incident

Ms. Jackson testified that on August 3, 2010, she was sitting in her living room when "all of a sudden the front door burst open and [Christopher] ran in." Christopher "looked a little uneasy .... like he had seen something that he didn't want to see." He was "talking pretty fast" and his tone of voice was "a little angry" and "a little loud."

Ms. Jackson testified that Christopher told her that "that girl is out there." When the prosecutor asked Ms. Jackson, "[W]hat else did he say?" she testified, "He didn't say anything else. I told him not to go back outside." The prosecutor then asked, "Could you explain, he said *that girl is outside.* Did he explain where she was outside?" Ms. Jackson then added that Christopher "said she was on B Street, which is about from where I'm sitting to that door."

The trial court estimated that this distance—from Ms. Jackson's house to B Street—was "[a]pproximately 35 feet." The assumption seemed to be that Christopher had seen Ms. Grayton on B Street where it intersected with Ms. Jackson's block, the 100 block of 49th Street, S.E., because the prosecutor then asked Ms. Jackson, "[H]ow wide of a street is B Street?" Ms. Jackson first responded that "[i]t's a two-lane street," but that she was "not sure of the width." Ms. Jackson then

---

4. In conducting our sufficiency analysis we are bound to consider the evidence as it was presented at trial. *Thomas v. United States,* 557 A.2d 599, 601 (D.C.1989) And because we determine that this evidence was insufficient, we need not address the admissibility of the hearsay the government used to prove Ms. Grayton's violation of the preliminary injunction on August 3, 2010.

5. While it is manifest that Ms. Jackson wished Ms. Grayton to cease all contact with both her and Christopher, Christopher did not appear at trial and the record says virtually nothing about Christopher's view of Ms. Grayton or of his desire to have contact with her.

stated that she "would say it's about as wide as this courtroom, you know, with cars parked on it." Again, the trial court supplied an estimate: "Why don't we say 22 feet." Notwithstanding defense counsel's observation that the courtroom "seems bigger," the court declined to revise its estimate: "Bigger than 22 feet? Well, this is the width we're talking about.... I'm sticking with 22 feet."

Ms. Jackson testified that after speaking to Christopher she immediately called 911 to report that Ms. Grayton had violated the preliminary injunction. Even though Christopher never identified "that girl" by name, Ms. Jackson testified that there was "only one person" whose presence "close to" her house would prompt her to call 911, and that person was "Mosiah Grayton." Ms. Jackson testified that the police responded to her call, but they did not see Ms. Grayton.

Ms. Jackson's testimony was the only evidence the government presented to prove the alleged August 3, 2010, violation of the preliminary injunction. In setting forth its findings, the trial court stated that it was "convinced beyond a reasonable doubt that Ms. Grayton on August 3rd of 2011 got within, oh, a maximum or minimum of the 70 feet or so from [Ms. Jackson's] home." The trial court further found that Ms. Grayton "was in contact with the grandson Christopher. Christopher rushed into the house and said ... that girl was out there, and I'm convinced that that was referring to Ms. Grayton and

that was in violation of the [preliminary injunction]."

### B. Evidence Regarding the January 14, 2011, Incident

Ms. Jackson and her granddaughter Melanie both testified about the January 14, 2011, incident. Ms. Jackson testified that a little after 8 p.m. on January 14 her cell phone rang. She noticed that the caller's number was "blocked," but she answered the phone because she thought it might be Christopher. Ms. Jackson recognized the caller's voice as belonging to Ms. Grayton.[6] Because the phone was set on "speaker," Melanie also was able to hear and recognize Ms. Grayton's voice.[7] Ms. Grayton said either, "You old bitch.... You should pay your phone bill, and you best be preparing for a funeral," or, "You old bitch, you need to pay your cell phone bill and prepare a funeral for your ... son." Ms. Grayton "kept raving and ranting" until Ms. Jackson told Ms. Grayton that she was in violation of the preliminary injunction and hung up. Ms. Jackson then called the police to report the offense.

In addition to Ms. Jackson and Melanie's testimony, Sergeant Brett Parson of the Metropolitan Police Department and Tracy White, a Community Supervision Officer with the Court Services and Offender Supervision Agency for the District of Columbia ("CSOSA"), both testified about admissions made by Ms. Grayton regarding the January 14, 2011, phone call.[8]

---

6. Ms. Jackson testified that she knew Ms. Grayton's voice "after hearing it for so long," and that she knew "the tone that [Ms. Grayton] uses."

7. Melanie testified that she had heard Ms. Grayton's voice on the telephone before, and specifically that she had heard voicemail messages that Ms. Grayton had left for Christopher on his cell phone.

8. Ms. Grayton moved to suppress these statements, and a hearing was held on her motion immediately prior to trial on March 31, 2011. The parties agreed in advance that the hearing testimony would be incorporated into the trial record if, as turned out to be the case, Ms. Grayton's motion to suppress was denied.

Sergeant Parson testified that he made arrangements with CSOSA to contact him when Ms. Grayton, who was under Officer White's supervision, was going to come into CSOSA's offices so that he could arrest her. On orders from her branch chief, Officer White set up a meeting with Ms. Grayton at the CSOSA office on January 20, 2012. Before Sergeant Parson's arrival, Officer White and her supervisor discussed the alleged violation on January 14, 2011, with Ms. Grayton. According to Officer White, Ms. Grayton admitted to contacting Ms. Jackson by telephone, but denied threatening her.

Sergeant Parson then joined the meeting. He explained to Ms. Grayton that there was a warrant out for her arrest as a result of her violation of the preliminary injunction and that they were waiting for a transport vehicle. According to Sergeant Parson's testimony, while they waited, Ms. Grayton made a phone call to an unidentified third person.[9] The room in which they were sitting together was small, and Sergeant Parson overheard Ms. Grayton inform that person, "I'm getting locked up. I called, I called her and I cursed her out so they are locking me up." Sergeant Parson acknowledged that at this point he had not read Ms. Grayton her *Miranda* rights.

The trial court credited the testimony of all the government witnesses regarding the January 14, 2011, incident and found Ms. Grayton guilty of contempt and attempted threats.

## II. The Insufficiency of Evidence Establishing Appellant's Violation of the Preliminary Injunction on August 3, 2010

Ms. Grayton contends that the evidence regarding the August 3, 2010, incident is legally insufficient because Christopher's hearsay statement to his grandmother— "that girl is out there .... on B street"— did not contain adequate information from which the trial court could conclude that Ms. Grayton violated the stay-away provision of the preliminary injunction on that date.

 We review challenges to the sufficiency of the evidence *de novo. United States v. Bamiduro,* 718 A.2d 547, 550 (D.C.1998). In conducting this review, we examine the record in the light most favorable to the government, giving the government the benefit of all reasonable inferences in its favor. *Bolden v. United States,* 835 A.2d 532, 534 (D.C.2003). We recognize "the province of the fact finder to weigh the evidence, resolve issues of credibility and to draw reasonable inferences from the evidence presented." *Griffin v. United States,* 861 A.2d 610, 613 (D.C.2004) (citation and internal quotation marks omitted). Notwithstanding the deference due to the trial court as the fact finder, "[w]e have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a [trier of fact] behaving rationally could find it persuasive beyond a reasonable doubt." *Davis v. United States,* 834 A.2d 861, 866 (D.C.2003) (alterations in original) (quoting *Rivas v. United States,* 783 A.2d 125, 134 (D.C. 2001) (en banc)) (internal quotation marks omitted). Evidence must establish more than the speculative "possibility that the elements are present. A conviction cannot rest on mere possibilities." *Malloy v. United States,* 246 A.2d 781, 783 (D.C. 1968).

 Applying these standards, we conclude that the evidence was insufficient

---

9. Sergeant Parson initially tried to stop Ms. Grayton from making the call because he thought she was going to call Ms. Jackson.

to prove beyond a reasonable doubt that Ms. Grayton disobeyed the preliminary injunction, and specifically that she violated the stay-away provision on August 3, 2010.[10] Ms. Grayton was not banished from the District of Columbia or even from Ms. Jackson's neighborhood. She was merely prohibited from coming within 100 feet of Ms. Jackson's house. But there was no evidence in the record that she violated this directive.

Ms. Jackson initially testified that the only information Christopher provided regarding Ms. Grayton's whereabouts was to say that "that girl"—whom Ms. Jackson understood to mean Ms. Grayton—"is out there."[11] Only in response to a leading question from the government, did Ms. Jackson add that Christopher had told her that Ms. Grayton was "on B Street"; but Christopher's out-of-court statements, as relayed by Ms. Jackson, gave no indication where on B Street he had seen Ms. Grayton.

The trial court's reckoning of Ms. Grayton's distance from Ms. Jackson's home appears to be based upon the assumption that Christopher was standing immediately outside of Ms. Jackson's home when he spotted Ms. Grayton on B Street, an assumption that is without support in the record.[12] While a reasonable trier of fact might infer from Christopher's use of the present tense ("that girl is out there") and from his demeanor (he was "a little angry," and "a little loud") that he was speaking of a relatively recent sighting, there is no indication in the record as to how much time had elapsed since Christopher had seen Ms. Grayton—whether it had been a matter of seconds, minutes, or more. Similarly, the record says nothing to indicate Christopher's location or distance from Ms. Jackson's home when he saw Ms. Grayton. He may have been at her door step, a few houses away, somewhere on B Street, or even on another cross-street that gave him a view of B Street.

The government suggested at oral argument that one can fairly infer from Christopher's apparent dismay at having seen Ms. Grayton that he had witnessed her transgressing the terms of the preliminary injunction. This is speculative: the record says nothing about Christopher's understanding of the precise terms of the preliminary injunction (which did not prohibit Ms. Grayton from contacting him). The government also argued in its brief that Ms. Jackson's instruction to Christopher not to go back outside supports a determination that Ms. Grayton violated the

---

10. To prove the elements of criminal contempt, D.C.Code § 11–944(a), committed outside the presence of the court, the government must prove "willful disobedience of a court order," *Baker v. United States*, 891 A.2d 208, 215 (D.C.2006). "In a criminal contempt case, as in any other criminal prosecution, each element must be proved beyond a reasonable doubt." *Davis*, 834 A.2d at 866.

11. Even the identification of Ms. Grayton as "that girl" requires the questionable inference that there was no other person to whom Christopher might have been referring. Although Ms. Jackson testified that only the sight of Ms. Grayton near her home would prompt *her* to call 911, that did not prove that it was Ms. Grayton whom *Christopher* saw.

12. The trial court estimated that the distance from Ms. Jackson's house to B Street was "[a]pproximately 35 feet," and that the width of B street was "[w]hy don't we say 22 feet," a total of 57 feet. The court subsequently found that Ms. Grayton "got within, oh, a maximum or minimum of the 70 feet or so" from Ms. Jackson's house. If by this imprecision the court was acknowledging that there was, in fact, no evidence in the record establishing where Christopher or Ms. Grayton were when Christopher allegedly saw Ms. Grayton, then the court should have acquitted; it should not have compensated for this evidentiary deficiency by giving Ms. Grayton the "benefit" of an additional 13 feet of distance from Ms. Jackson's house.

preliminary injunction. But since Ms. Jackson had no information about Ms. Grayton's precise whereabouts, either from her own observation or from her grandson, this argument also fails.

■ In short, to render a verdict of guilt on the sparse facts provided, one must simply assume that Christopher's vantage point covered the zone protected by the preliminary injunction when he saw Ms. Grayton, and likewise infer that he saw Ms. Grayton in that zone.[13] While the prosecution is "not required to negate every possible suggestion of innocence" to establish guilt in a criminal trial, *Nowlin v. United States*, 782 A.2d 288, 291 (D.C. 2001), we find that the foundational gaps in the evidence here require the trier of fact "to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation[,]" *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987).[14]

### III. Appellant's Remaining Arguments

■ Ms. Grayton's remaining claims—that the trial court erred when it denied her motion to suppress two statements for

*Miranda* violations [15] and when it denied her motion for acquittal for both contempt charges [16]—present legal issues which we review *de novo*. *Hill v. United States*, 858 A.2d 435, 442 (D.C.2004) (quoting *Reid v. United States*, 581 A.2d 359, 363 (D.C. 1990)) ("[W]hether 'on the duly established facts, [appellant] was subjected to custodial interrogation without the benefit of *Miranda* warnings is a question of law,' which we review *de novo*.") (second alteration in original); *Guzman v. United States*, 821 A.2d 895, 897 (D.C.2003) (quoting *Johnson v. United States*, 756 A.2d 458, 461 (D.C. 2000)) ("[T]he standard by which we review a denial of a motion for judgment of acquittal is *de novo*, and we, 'like the trial court, determine whether the evidence, viewed in the light most favorable to the government, was such that a reasonable juror could find guilt beyond a reasonable doubt.' ").

Ms. Grayton argues that the trial court erroneously denied her motion to suppress two statements she made when she visited her community supervision officer on January 20, 2011, because she had not been advised of her rights pursuant to *Miranda*

---

**13.** Even if the trial court had an adequate foundation for its assumption that Christopher was within 100 feet of Ms. Jackson's house when he saw Ms. Grayton on B Street, the record tells us nothing about how much of B Street could be seen from that vantage point, *i.e.*, whether segments of B Street not covered by the order were also visible.

**14.** We are not persuaded by the government's citation to *Boddie v. United States*, 865 A.2d 544 (D.C.2005), in support of its argument that the trial court reasonably inferred Ms. Grayton's violation of the stay-away provision. In *Boddie*, the issue was whether the government had presented adequate proof that defendant had been selling drugs within 1000 feet of a school. *Id.* at 545. The arresting officer testified that the distance from a neighborhood school to the alley where defendant was arrested was approximately 550 feet. *Id.* at 546. The officer also testified that

he had seen defendant selling drugs in a courtyard of a public housing complex adjacent to and just beyond the alley. *Id.* Based on that record, we determined "that reasonable jurors could reasonably infer" that defendant was within 1000 feet of the school when he sold drugs. *Id.* at 548 n. 7. The quantum of evidence submitted in *Boddie*—where there was testimony about the defendant's precise location as well as distances from which one could reasonably infer the defendant's presence within the prohibited area—far outweighs the evidence submitted in this case.

**15.** *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**16.** Since we are reversing the August 3, 2010, conviction on separate grounds, our analysis is relevant only to the January 14, 2011, contempt conviction.

*v. Arizona.* With respect to both statements, this claim is without merit.

▆▆▆▆ An individual is not entitled to *Miranda* warnings unless she is subject to custodial interrogation. *Graham v. United States,* 905 A.2d 717, 728 (D.C.2008) (citing *California v. Beheler,* 463 U.S. 1121, 1123–25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Ms. Grayton was not "in custody" for *Miranda* purposes when she made her first statement to Officer White. Our analysis begins and ends with *Minnesota v. Murphy,* 465 U.S. 420, 433, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). In that case, the Supreme Court held that a probation interview "arranged by appointment at a mutually convenient time" does not give rise to the coercive atmosphere that *Miranda* warnings are intended to dispel. *Id.*

▆▆▆▆ For a different reason, Ms. Grayton's second statement was not obtained in violation of *Miranda.* At that point, she had been placed under arrest and was in custody. But the statement admitted through Sergeant Parson's testimony—Ms. Grayton's side of a telephone conversation with a third party, whom she elected to call—was not elicited by "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Thus, Ms. Grayton's statement was not the product of an interrogation for *Miranda* purposes.

Lastly, we decline to hold that the trial court erred when it denied Ms. Grayton's motion for judgment of acquittal on the two contempt charges.

The record shows that Ms. Grayton was initially charged under D.C.Code § 23–1329, which provides that a person may be convicted of contempt if:

it is established that [a person under a conditional release order pending trial, pursuant to D.C.Code § 23–1321] has intentionally violated a condition of his release. Such contempt proceedings shall be expedited and heard by the court without a jury.

*See Grant v. United States,* 734 A.2d 174, 177 (D.C.1999). After the close of evidence, defense counsel alerted the court that the June 18, 2010, preliminary injunction did not fall under the provisions of D.C.Code § 23–1321, because it was not issued in conjunction with Ms. Grayton's release pretrial in another criminal case, and no evidence had been presented at trial to establish that Ms. Grayton was subject to conditional release. Ms. Grayton argued post-trial and reiterates on appeal that the trial court could not convict her under the general contempt statute, D.C.Code § 11–944, because that statute entitled her to a jury trial; rather, the trial court's only option was to grant her motion for a judgment of acquittal.

▆▆▆▆ A charging document, such as an information or indictment, "serves three vital constitutional functions." *Byrd v. United States,* 579 A.2d 725, 727 (D.C. 1990). First, it ensures that the accused has adequate notice of the charges to prepare a defense. *Id.* Second, it describes the crime with "sufficient specificity" to guard the accused against future prosecution for the same offense. *Id.* Third, it "protects against oppressive actions of the prosecutor or a court, who may alter the charge to fit the proof." *Id.* (quoting *Scutchings v. United States,* 509 A.2d 634, 636 (D.C.1986)). Thus, we have held that "[a] variance between allegation and proof is not fatal . . . unless the defendant has been deprived of an adequate opportunity to prepare a defense or has been exposed to the risk of being prosecuted for the same two offenses" and that "[w]here

there has been ... no more than a miscitation of a statute, reversal of a conviction is required only if the defendant is prejudiced." *Id.* at 727, 728; *see also* Super. Ct.Crim. R. 7(c) (an "[e]rror in the citation or its omission shall not be ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to the defendant's prejudice").

 The reference to D.C.Code § 23–1329 in the information appears to have been a simple citation error [17] from which Ms. Grayton suffered no prejudice.[18] We agree with the trial court that the original information was specific enough to give the defendant adequate notice of the charges against her, and did not create a plausible risk of duplicitous prosecution. The information specified by date and case number the order Ms. Grayton was alleged to have violated and described her conduct on August 3, 2010, and January 14, 2011, that was alleged to have violated that order. Moreover, there is no indication on this record that the prosecutor was acting "oppressively" to alter the charge to fit the evidence adduced at trial; to the contrary, the government attempted only to prove that Ms. Grayton acted in contempt of the January 18, 2010, order—it never alleged or sought to offer any evidence that Ms. Grayton violated a conditional release order.

 Ms. Grayton argues that had she been properly charged she would have been entitled to a jury trial. Our analysis of Ms. Grayton's right to a jury trial on a contempt charge is backward-looking, however, and turns on the sentence actually imposed. *Frank v. United States,* 395 U.S. 147, 149, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969) (a defendant's constitutional right to a jury trial turns on the seriousness of the offense and "in prosecutions for criminal contempt where no maximum penalty is authorized, the severity of the penalty actually imposed is the best indication of the seriousness of the particular offense"); *Brookens v. Comm. on Unauthorized Practice of Law,* 538 A.2d 1120, 1123 (D.C.1988) (a defendant's "statutory right to a jury trial in a contempt proceeding is a function of the actual sentence imposed rather than the potential sentence to which the defendant is exposed by virtue of the charges against him"). Here, for each contempt conviction the trial court imposed a suspended sentence of 180 days incarceration, to run concurrently. Because as sentenced she did not face more than six months imprisonment,[19] Ms. Grayton had no jury trial right to invoke and cannot claim that she was prejudiced by the abrogation of a right she did not possess.

For the reasons set forth above, we reverse Ms. Grayton's conviction of criminal contempt on August 3, 2010, and affirm her convictions for criminal contempt and threats on January 14, 2011.

*So ordered.*

---

17. This error is perhaps attributable to the fact that Ms. Grayton was arrested while visiting her community supervision officer.

18. Ms. Grayton's reliance on Super. Ct.Crim. R. 7(e) permitting an information to be amended "at any time before the verdict or finding if no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced" is unavailing in light of Rule 7(c), which makes clear that errors in citation may be disregarded in the absence of prejudice to the defendant.

19. *See Brookens,* 538 A.2d at 1123 ("[I]n order for the offense of contempt to be considered non-petty, it must be one in which the fine exceeds $300 or the imprisonment exceeds six months.").