*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1423

PATRICK BROOM A/K/A PATRICK BROWN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-13790-12)

(Hon. Stuart Nash, Trial Judge)

(Argued January 21, 2015                      Decided June 18, 2015)

*Ian A. Williams* for appellant.

*Christopher Howland*, Assistant United States Attorney, for appellee. *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Christian Natiello*, and *John Cummings,* Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

MCLEESE, *Associate Judge*: Appellant Patrick Broom challenges his convictions for possession of an unregistered firearm and unlawful possession of a firearm. We reverse, because Mr. Broom's convictions rest on evidence of

statements he made to the police after being subjected to custodial interrogation in violation of the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966).

## I.

After holding a pretrial hearing on Mr. Broom's motion to suppress evidence, the trial court denied the motion in part and granted it in part. Viewed in the light most favorable to the trial court's suppression ruling, the evidence at the hearing was as follows. On August 7, 2012, Metropolitan Police Department Officers Donte Allen and Arthur Kimball went to an apartment building at 5044 C Street, SE, in response to a complaint about destruction of property. The property manager of the building told the officers that he had noticed a bullet hole while renovating apartment 11. When the officers went into that apartment, they saw a bullet hole in the wall between that apartment and apartment 12, which was next door. Based on the location of the bullet in the wall and the characteristics of the holes made by the bullet, the officers concluded that the bullet had come from apartment 12. At the time, the officers did not know when the bullet holes had been made.

The officers went over and knocked on the door of apartment 12. Ms. Shawnta Hagans, who lived in apartment 12, opened the door. After explaining the situation to Ms. Hagans, the officers asked if they could discuss the matter in private. After Ms. Hagans gave the officers permission, the officers entered the apartment. Mr. Broom was present in the apartment but stated that he did not live there. Ms. Hagans's child was also in the apartment. The record does not indicate the child's age, but the child was referred to at trial as a baby. As soon as the officers entered the apartment, Officer Kimball saw a bullet hole in the wall. The officers immediately handcuffed Mr. Broom and Ms. Hagans. The officers told Mr. Broom and Ms. Hagans that they were not under arrest and were being handcuffed for the officers' safety. Mr. Broom and Ms. Hagans were not free to leave at that point. After the officers said that they believed that a firearm was in the apartment, Mr. Broom and Ms. Hagans both denied knowledge of a firearm in the apartment.

At that point, Ms. Hagans's child started crying, so the officers removed Ms. Hagans's handcuffs to permit Ms. Hagans to tend to her child. The officers then told Mr. Broom and Ms. Hagans that if there was a firearm inside the apartment, both Mr. Broom and Ms. Hagans could be placed under arrest and the child would be sent to Child and Family Services. According to Officer Allen, this statement

was not a threat but rather was advice to Mr. Broom and Ms. Hagans about what would happen if they were not honest. Ms. Hagans started crying and pleading with Mr. Broom to tell the officers where the weapon was. Mr. Broom said he would be honest with the officers, got up off the couch, motioned with his head toward the kitchen, and indicated that the firearm was in the kitchen. Mr. Broom then walked over to the kitchen, escorted by Officer Allen, who was holding Mr. Broom's arm. After Mr. Broom motioned with his foot to a kitchen cabinet, the officers opened the cabinet and found a firearm. Officer Kimball saw that the firearm did not have a magazine. He asked Mr. Broom where the magazine was, and Mr. Broom said that the magazine was in the bedroom. Ms. Hagans told Officer Kimball that she knew where the magazine was, went with Officer Kimball to the back bedroom, and showed Officer Kimball the magazine and additional ammunition.

After the officers located the firearm and ammunition, they advised Mr. Broom that he was under arrest. Officer Allen subsequently smelled marijuana and asked Mr. Broom where the marijuana was. Mr. Broom directed Officer Allen to a bag of marijuana in a kitchen cabinet.

The officers were in the apartment for about ten minutes before Mr. Broom directed the officers to the firearm. Mr. Broom subsequently indicated that the firearm was his friend's and explained how the firearm had gone off. At no point did the officers advise Mr. Broom or Ms. Hagans of their *Miranda* rights. The officers did not place Ms. Hagans under arrest on the scene, because she did not appear to know where the firearm was located. Ms. Hagans was subsequently charged but was not convicted at trial.

After the suppression hearing, the United States conceded that the officers had violated the requirements of *Miranda* by asking Mr. Broom about the marijuana after Mr. Broom had been placed under arrest. The United States therefore conceded that Mr. Broom's statement about the marijuana, as well as the evidence of the recovery of the marijuana, should be suppressed. *But see United States v. Patane*, 542 U.S. 630 (2004) (*Miranda* violation requires suppression of statements but not tangible fruits of statements). The trial court accepted that concession and also ruled that the officers had violated the requirements of *Miranda* by asking about the magazine after the firearm had been found. The trial court therefore suppressed the statements about the magazine, as well as any evidence about the recovery of the magazine. The trial court declined, however, to

suppress evidence of Mr. Broom's statements indicating the location of the firearm, concluding that Mr. Broom was not in custody at time of the questioning about the firearm. In support of that conclusion, the trial court found that the statement about taking the child was not intended to coerce Mr. Broom and Ms. Hagans to cooperate, but rather was "just stating the facts of life."

## II.

On appeal, Mr. Broom contends that he was impermissibly subjected to custodial interrogation before he disclosed the firearm's location. "Whether[,] on the duly established facts, appellant was subjected to custodial interrogation without the benefit of *Miranda* warnings is a question of law, which we review *de novo*." *Grayton v. United States*, 50 A.3d 497, 505 (D.C. 2012) (brackets and internal quotation marks omitted). We agree that Mr. Broom was custodially interrogated in violation of *Miranda*.

## A.

Before interrogating a suspect in custody, the police generally must warn the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an

attorney, either retained or appointed."[1]  *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011) (internal quotation marks omitted).  These warnings are "designed to ward off the inherently compelling pressures of custodial interrogation."  *Howes v. Fields*, 132 S. Ct. 1181, 1188 (2012) (internal quotation marks omitted).

A suspect is in custody when the suspect has been subjected to "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."  *J.D.B.*, 131 S. Ct. at 2402 (internal quotation marks omitted).

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.  In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.  . . .

> Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last.  Not all restraints on freedom of movement amount to custody for purposes of *Miranda*.  We have declined to accord talismanic power to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant environment presents the

---

[1]  Compliance with this requirement is excused if the police questioning is "reasonably prompted by a concern for the public safety."  *New York v. Quarles*, 467 U.S. 649, 656 (1984).  Although the United States relied on that exception in the trial court, the United States does not rely on the exception in this court.  We therefore do not address whether the questioning in this case was lawful under the public-safety exception.

same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. Our cases make clear that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.

*Howes*, 132 S. Ct. at 1189-90 (brackets, ellipses, citations, and internal quotation marks omitted).

"In evaluating whether a person was in custody for *Miranda* purposes, the only relevant inquiry is how a reasonable man or woman in the suspect's position would have understood his or her situation." *White v. United States*, 68 A.3d 271, 276 (D.C. 2013) (internal quotation marks omitted). Relevant factors include the use of handcuffs or other physical restraints on the suspect, *id.* at 279; communications from the police to the suspect, such as whether the police informed the suspect that the suspect was not under arrest and did not need to speak with the officers, *In re I.J.*, 906 A.2d 249, 260 (D.C. 2005); the length of the detention or questioning, *White*, 68 A.3d at 283; the nature of the questioning, such as whether it was accusatory or coercive, *id.* at 281; the location of the encounter, such as whether it occurred in public or private, *In re I.J.*, 906 A.2d at 260-61; the nature of any display of force by the police, *Bates v. United States*, 51 A.3d 501, 510 (D.C. 2012); and whether the suspect was confronted with evidence of guilt, *id.* at 510-11.

**B.**

We turn first to whether Mr. Broom was in custody at the time of the statements at issue. At that point, Mr. Broom was not free to leave but had not yet been placed under formal arrest. We assume for current purposes that Mr. Broom was at that time subject only to a lawful investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). This court has held, however, that a lawful *Terry* stop may be sufficiently coercive as to give rise to custody for *Miranda* purposes. *See, e.g.*, *In re I.J.,* 906 A.2d at 261. As we explained,

> The facts and circumstances that justify an encounter as a permissible *Terry* stop for Fourth Amendment purposes will not necessarily dispose of the related—but different—question of whether there is custody within the meaning of *Miranda* under the Fifth Amendment. With respect to the latter inquiry, the actions and words of the police must be evaluated in context to determine whether there was any show of authority or other message conveyed which would cause the suspect to reasonably think he or she was not free to terminate the questioning and leave and that his or her freedom was being restrained to the degree associated with a formal arrest. . . . When a reasonable person would believe that his or her freedom has been restrained as in a formal arrest, that person is in custody for Fifth Amendment purposes, regardless of the reasonableness of the basis for or scope of the interview conducted by the investigating officer, as measured under the Fourth Amendment.

*Id.* (citations and internal quotation marks omitted).[2]

Applying these principles, we conclude that Mr. Broom was in custody for *Miranda* purposes before he disclosed the firearm's location. We rely primarily on three circumstances.

**1.**

Once the officers entered Ms. Hagans's apartment and saw the bullet hole, they immediately asserted control over the situation by handcuffing Mr. Broom and Ms. Hagans. Although handcuffing is not by itself dispositive of custody, "it is recognized as a hallmark of a formal arrest." *White*, 68 A.3d at 279 (internal quotation marks omitted). Mr. Broom argues that this court should create a rebuttable presumption that a handcuffed suspect is in custody for *Miranda* purposes. We adhere, however, to the approach in *White*, under which the use of handcuffs must be considered in context but can "go a long way toward making a

---

[2] In *Howes,* the Supreme Court stated that the "temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." 132 S. Ct. at 1190 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010)). The United States has not contended in this case that *Howes* or *Shatzer* undermine our holding in *In re I.J.* We therefore do not address that issue.

reasonable [suspect] feel as if he were at the mercy of the police and restrained to a degree associated with formal arrest." 68 A.3d at 280.

**2.**

The officers' statements in this case "contributed materially to an atmosphere of coercion and custody." *Bates*, 51 A.3d at 511 (brackets and internal quotation marks omitted). *See generally, e.g.*, *White*, 68 A.3d at 281 ("whether the nature and length of the officers' questioning was accusatory or coercive factors into the custody analysis") (internal quotation marks omitted). After seeing the bullet hole, the officers promptly made the accusatory statement that they believed a firearm was in the apartment. When Mr. Broom and Ms. Hagan responded with denials, the officers told Mr. Broom and Ms. Hagans that if there was a firearm inside the apartment, both Mr. Broom and Ms. Hagans could be placed under arrest and Ms. Hagans's child would be sent to Child and Family Services. We view the latter statement in particular as highly coercive.

Understood naturally, the statement could be viewed as a threat to arrest both suspects and take Ms. Hagans's child into state custody unless one of the suspects took responsibility for the firearm the officers believed was in the

apartment. Officer Allen's testimony corroborates this reading of the statement, because Officer Allen described the statement as advising the suspects "of exactly what will happen **if they were not going to be honest**" (emphasis added). Ms. Hagans's response to the statement further corroborates this reading, because Ms. Hagans immediately began to cry and plead with Mr. Broom to tell the officers where the firearm was. It is true that Officer Allen denied intending to threaten Mr. Broom and Ms. Hagans, and the trial court found as a matter of fact that the officers were not attempting to coerce Mr. Broom and Ms. Hagans into admitting where the firearm was. In making that finding, however, the trial court did not address Officer Allen's testimony that Officer Allen was letting Mr. Broom and Ms. Hagans know what would happen if they were not honest. That testimony seems to reflect an intent to induce Mr. Broom or Ms. Hagans to stop denying knowledge of the firearm. In any event, the question whether a suspect was in custody for *Miranda* purposes generally turns on the objective circumstances, rather than the officers' intent. *Yarborough v. Alvarado*, 541 U.S. 652, 654 (2004) ("The *Miranda* custody inquiry is an objective test . . . ."). We conclude that a reasonable person would have viewed the reference to taking custody of Ms. Hagans's child to be highly coercive. *See, e.g.*, *State v. Boyle*, 246 P.3d 413, at *1-4 (Kan. Ct. App. 2011) (Table) (suspect was in custody for *Miranda* purposes where no physical restraints were imposed upon suspect, but suspect was

questioned for forty-five minutes and officers made statement that would reasonably be understood to mean that suspect's children would be taken into protective custody if suspect and his fiancée did not cooperate); *State v. Brown*, 632 N.E.2d 970, 971-73 (Ohio Ct. App. 1993) (per curiam) (suspect was in custody for *Miranda* purposes where suspect was told that if he did not attend meeting with social worker and police officer, suspect's stepdaughter would be removed from home; meeting was in small private office with closed door; suspect was told he was not under arrest and was free to leave; police officer was physically imposing; and meeting lasted over an hour); *cf. Lynumn v. Illinois*, 372 U.S. 528, 529-34 (1963) (where officers told suspect that if she did not cooperate her financial aid would be cut off and her children would be taken from her, circumstances were compellingly coercive, and suspect's ensuing confession was involuntary).

Although the parties refer to the child as also being Mr. Broom's, it is unclear what information the officers had on the scene on that point. We do not view that issue as critical, however, in the circumstances of this case. There appears to be no dispute that the officers were aware that the child was Ms. Hagans's. When the officers chose to suggest to Mr. Broom and Ms. Hagans that the child would be taken into custody unless Mr. Broom and Ms. Hagans

cooperated, the officers reasonably would have known that their statement was likely to have a strong coercive effect on Mr. Broom, either directly if the child was Mr. Broom's or in any event indirectly through Ms. Hagans. In fact, the statement had an entirely predictable effect, causing Ms. Hagans to start crying and begging Mr. Broom to cooperate with the officers.

As the United States points out, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. Indeed, the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation and internal quotation marks omitted). *See also, e.g.*, *Graham v. United States*, 950 A.2d 717, 732 (D.C. 2008) ("Only 'state action' implicates a defendant's rights under Fifth Amendment."). Pressure applied by private parties thus often is not determinative in the *Miranda* context. *See, e.g.*, *Arizona v. Mauro*, 481 U.S. 520, 529 (1987) (police did not interrogate suspect by permitting wife to speak with suspect and hoping that suspect would make admission; suspect "was not subjected to compelling influences, psychological ploys, or direct questioning"); *Graham*, 950 A.2d at 732-35 ("[N]umerous courts have held the dictates of *Miranda* . . . inapplicable to questioning of suspects in custody by private citizens acting on their own

initiative."; police did not interrogate suspect by permitting mother to speak with suspect).  On the other hand, it is well settled that in some circumstances the requirements of *Miranda* are applicable to conduct of third parties, "in order to prevent law enforcement officials from circumventing . . . *Miranda*['s] requirements . . . ." *People v. Robledo*, 832 P.2d 249, 250 (Colo. 1992).

This court has held that, in determining whether the conduct of third parties is attributable to the police for purposes of *Miranda*, we must focus on how a reasonable person in the suspect's position would perceive the situation.  *Graham*, 950 A.2d at 734-35.  In this case, a reasonable person in Mr. Broom's position would have understood that Ms. Hagans was not acting on her own initiative in begging him to cooperate with the officers, and that, to the contrary, the officers' coercive statement had predictably caused Ms. Hagans to join the officers in pressuring Mr. Broom to cooperate.  In these circumstances, we conclude that Ms. Hagans's conduct should be taken into account when determining whether Mr. Broom's circumstances were so coercive as to rise to the level of custody for *Miranda* purposes.  *See United States ex rel. Doss v. Bensinger*, 463 F.2d 576, 577-79 (7th Cir. 1972) (suspect was subjected to custodial interrogation where police confronted suspect with accomplice who had confessed, and accomplice urged suspect to show police where gun was hidden); *Commonwealth v. Hamilton*,

285 A.2d 172, 173-75 (Pa. 1971) (same where police confronted suspect with accomplice who had confessed, and accomplice accused suspect of being triggerman in crime); *cf., e.g.*, *Graham*, 950 A.2d at 735 (suggesting that questioning by private party would be attributable to police for *Miranda* purposes if "questioning was given the stamp of official authority" or if "government officials forced the suspect to answer the private party's questions") (footnote omitted); *Nelson v. Fulcomer*, 911 F.2d 928, 935 (3d Cir. 1990) (suspect was subjected to custodial interrogation if suspect made statement after accomplice acting at police direction told suspect that accomplice had confessed; "[C]onfronting a suspect with his alleged partner in crime and the fact that the partner confessed is precisely the kind of psychological ploy that [the Supreme Court's] definition of interrogation [for *Miranda* purposes] was designed to prohibit."); *Wilson v. O'Leary*, 895 F.2d 378, 379-81 (7th Cir. 1990) (suspect was subjected to custodial interrogation where officer seized suspect and took suspect to parking lot and stood by while friends and family of victim questioned suspect; "Police may not avoid *Miranda* by delegating the questioning to the victims of the crime or their relatives.").

**3.**

Before Mr. Broom directed the officers to the firearm, Ms. Hagans had signaled to the officers that it was Mr. Broom who was responsible for the firearm. Mr. Broom thus was aware that the officers believed there was a firearm in the apartment and that the officers had been told that Mr. Broom knew where the firearm was. These circumstances would have contributed to a reasonable conclusion that Mr. Broom was no longer merely the subject of an investigatory detention. *Cf., e.g.*, *In re I.J.*, 906 A.2d at 261 (in some circumstances, "a suspect would reasonably believe that the police intend to arrest him because the police have evidence against him"); *People v. Hoover*, 620 N.E.2d 1152, 1160 (Ill. App. Ct. 1993) ("[E]ven information from a suspect which implicates another provides sufficient grounds for probable cause if buttressed by corroborating evidence or by the officer's knowledge and experience.").

**4.**

We have identified three circumstances that in our view point strongly toward the conclusion that Mr. Broom was in custody at the time he directed the officers to the firearm: Mr. Broom was detained in handcuffs; the officers had

made a statement that would reasonably be understood as a highly coercive threat to take Ms. Hagans's child into state custody, which predictably led Ms. Hagans to cry and beg Mr. Broom to cooperate with the officers; and Mr. Broom would reasonably have viewed Ms. Hagans's implicit accusation as strengthening the evidence that the officers had against Mr. Broom. We must consider the totality of the circumstances, however. *White*, 68 A.3d at 276. The United States emphasizes that the officers had advised Mr. Broom and Ms. Hagans that they were not under arrest and were being handcuffed only for officer safety; that there was no evidence that the officers drew weapons or acted in a threatening or aggressive manner; and that the officers removed the handcuffs from Ms. Hagans to permit her to care for her child. We further note that the encounter was relatively brief, lasting only about ten minutes before Mr. Broom directed the officers to the firearm. We do not view these additional circumstances as outweighing the circumstances that support the conclusion that Mr. Broom was in custody. Most significantly, although telling a suspect that he is not under arrest is relevant to whether the suspect has been placed in *Miranda* custody, making such a statement is not dispositive. *See, e.g.*, *United States v. Turner*, 761 A.2d 845, 852-53 (D.C. 2000) (suspect was in *Miranda* custody after police told suspect that police were executing search warrant for suspect's hair samples and bodily fluids, even though police had previously informed suspect that he was not under arrest); *United States*

*v. Newton*, 369 F.3d 659, 675-77 (2d Cir. 2004) (suspect in *Miranda* custody even though suspect had been informed that he was not under arrest; "[T]elling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained."). As the United States notes, we have said that a stop is unlikely to be custodial for *Miranda* purposes if the suspect is told both that he is not under arrest and that he does not need to talk to the police. *See, e.g.*, *In re I.J.*, 906 A.2d at 260. In the present case, however, the officers did not tell Mr. Broom that he did not need to speak with them.

Considering the totality of the circumstances, we conclude that Mr. Broom was in custody before he directed the officers to the firearm.

**B.**

Although the United States does not dispute that the officers interrogated Mr. Broom, the United States does argue that Mr. Broom's incriminating statements were not the product of the officers' interrogation but rather were triggered by Ms. Hagans's conduct in crying and begging Mr. Broom to cooperate

with the officers. For the reasons we have already explained, however, we conclude that Ms. Hagans's conduct is attributable to the officers for *Miranda* purposes. Mr. Broom's incriminating statements thus are properly understood to have been caused by the officers' interrogation.

## III.

For the foregoing reasons, we conclude that Mr. Broom's incriminating statements were obtained as a result of custodial interrogation in violation of the requirements of *Miranda*. Evidence of those statements was therefore inadmissible as substantive evidence of Mr. Broom's guilt. *See, e.g.*, *Harris v. New York*, 401 U.S. 222, 224 (1971). The United States has not contended that admission of evidence of those statements was harmless. We therefore reverse the judgment and remand for further proceedings.[3]

---

[3] Mr. Broom raises two additional issues that we need not address on the merits. First, Mr. Broom argues that the officers did not have adequate grounds to conduct a *Terry* stop and to handcuff Mr. Broom during that *Terry* stop. We agree with the United States, however, that Mr. Broom did not properly present those issues to the trial court, instead raising other Fourth Amendment contentions. We see no reason for reversal on this ground. *See, e.g.*, *Lowery v. United States*, 3 A.3d 1169, 1177 (D.C. 2010) ("The failure to assert a particular ground in a pre-trial suppression motion operates as a waiver of the right to challenge the subsequent admission of evidence on that ground.") (brackets and internal quotation marks omitted); *Smith v. United States*, 561 A.2d 468, 471 (D.C. 1989) (reviewing waived Fourth Amendment claim for plain error). Second, Mr. Broom

*So ordered.*

---

argues that the trial court erroneously ruled that Mr. Broom opened the door during trial to the admission of a statement that was otherwise inadmissible under *Miranda*. We see no reason to expect that this issue would recur in any retrial, and we therefore do not address it. *See, e.g.*, *Johnson v. United States*, 701 A.2d 1085, 1087 (D.C. 1997) (after court reversed on one ground, it addressed other claims "likely to arise in a new trial").